

# NUMBER 13-24-00033-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JESSICA BUNDREN,                                                          Appellant,

v.

THE STATE OF TEXAS,                                                      Appellee.

## ON APPEAL FROM THE 272ND DISTRICT COURT
## OF BRAZOS COUNTY, TEXAS

## MEMORANDUM OPINION

### Before Chief Justice Tijerina and Justices Peña and West
### Memorandum Opinion by Justice Tijerina

Appellant Jessica Brunden appeals her conviction of injury to a child. *See* TEX. PENAL CODE § 22.04(a)(1), (b)(2). Appellant was sentenced to life imprisonment. By four issues, appellant contends (1) the evidence is insufficient to support the allegation that she intentionally or knowingly caused serious bodily injury to a child, Amy, her stepdaughter, by striking her (2) the evidence is insufficient to support the allegation that

she intentionally or knowingly caused serious bodily injury to Amy by omission by failing to protect Amy from another or by failing to seek prompt medical attention, (3) the trial court improperly admitted multiple photos of Amy, and (4) her trial counsel rendered ineffective assistance by failing to object to hearsay and extraneous offense evidence. We affirm.[1]

## I. SUFFICIENCY OF THE EVIDENCE

By her first and second issues, appellant contends the evidence is insufficient to support that she committed the offense of injury to a child by any of the means charged.

### A. Standard of Review and Applicable Law

In a sufficiency review, we consider all the evidence in the light most favorable to the verdict and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt based on the evidence and reasonable inferences from that evidence. *Baltimore v. State*, 689 S.W.3d 331, 341 (Tex. Crim. App. 2024); *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014); *Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). All evidence, whether properly or improperly admitted, is considered and direct and circumstantial evidence is treated equally. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013).

The fact finder has the duty to resolve all factual disputes and conflicts in the testimony. *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021). Additionally, the fact finder is the exclusive judge of the credibility of witnesses and the weight to be

---

[1] This appeal was transferred to this Court from the Tenth Court of Appeals pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE § 73.001.

given to their testimony and may "draw reasonable inferences from basic facts to ultimate facts." *Id.* We must presume that all conflicts in the evidence were resolved by the fact finder in favor of the prosecution, and we must defer to those factual determinations. *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023).

We measure the sufficiency of the evidence in reference to the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327.

Here, the State alleged that appellant committed injury to a child either acting alone or under the law of parties. As charged here, a person commits injury to a child if she (1) intentionally or knowingly caused serious bodily injury to the child by striking the child with her hand, a belt, or a hard object, or by causing the child to strike her head on a hard object; or (2) assumed care, custody, or control of the child and intentionally or knowingly by omission caused serious bodily injury to the child by either (a) failing to protect the child from injury from another or (b) failing to seek prompt medical treatment for the child's injuries. *See* TEX. PENAL CODE § 22.04(a)(1), (b)(2). Under the law of parties, appellant committed injury to a child if "acting with intent to promote or assist the commission of the offense, [s]he solicit[ed], encourage[d], direct[ed], aid[ed], or attempt[ed] to aid the other person to commit the offense." *Id.* § 7.02(a)(2); *Wilson v. State*, 714 S.W.3d 900, 911

3

(Tex. App.—Eastland 2025, no pet.) ("A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." (quoting TEX. PENAL CODE § 7.01)).

Injury to a child is a first-degree felony when the mental state is intentionally or knowingly and the result is serious bodily injury. TEX. PENAL CODE § 22.04(e). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Wright v. State*, 494 S.W.3d 352, 362 (Tex. App.—Eastland 2015, pet. ref'd) The court of criminal appeals has determined "that 'act or omission' constitute the means of committing the course of conduct element of injury to a child," and a jury need not be unanimous on the means of committing the offense. *Jefferson v. State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006); *see also Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) ("Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct."). Therefore, we may affirm the conviction if the evidence is sufficient as to one of the submitted theories. *See Jefferson*, 189 S.W.3d at 312 ("We believe that it would be equally 'absurd' to set appellant free because, for example, six jurors may have believed that he struck the fatal blow to the child while six other jurors may have believed that he failed to pick up the phone and call 9–1–1 to seek medical help for a child who was obviously very seriously injured and in great distress."); *Creel v. State*, 710 S.W.2d 120, 130–31 (Tex. App.—S.A. 1986), *aff'd*, 754 S.W.2d 205 (Tex. Crim. App. 1988) ("[W]here alternative theories are submitted to the jury and a general verdict is returned,

4

the conviction will be upheld if the evidence is sufficient to support either theory.").

**B.     The Evidence**

On October 27, 2020, Justin Hopper, Amy's father, called 911 and reported that Amy, a six-year-old child, was in cardiac arrest. Daniel Green, a paramedic with the Bryan Fire Department, testified that he was dispatched to appellant's residence and was told that CPR was being performed on the child. Green stated that cardiac arrest for a child Amy's age is "[a]bnormal," which raised the paramedic's concerns.

Green explained that they "were not met by anyone outside. There was no commotions, as you could say. It was just a very odd approach to this particular call." When Green arrived, appellant stood in the doorway "and was very calm in nature." Green said that appellant exhibited no "sense of urgency," and "[t]ypically we're not met with that type of calmness on that level of a call, especially involving a kid." Appellant confirmed that they were at the correct address, and "she turned and walked into the house," and Green followed her. Appellant did not tell Green where to go once he entered the house. Green testified that he then saw a child sitting in the living room who he initially thought was the patient because she was the same age as the patient's reported age and had bruises. Green asked appellant if the child in the living room was the patient. Appellant said, "No," and she "pointed back to a hallway" and said, "She's down there." Appellant did not lead Green to Amy's location and "stayed right by the counter in the kitchen." Green went to the location, and when he "turned left down a hallway . . . there was a gentleman down at the end of the hallway by a door that was entering the bedroom." The man said, "Help her. She fell down some stairs 20 minutes ago."

5

Green saw Amy lying on the floor, and she was "severely bruised" "[a]ll over." Green stated Amy had "racoon eyes which is very deep bruising around the base of her eyes which is very indicative of a basilar skull fracture." Green explained that "it was pretty evident" that CPR would not help Amy because she "had signs incompatible with life." Green noticed bruises which were "in multiple stages of healing . . . meaning . . . the bruises were received at different times." Green observed "a lot more bruising to her stomach and her torso area." Green then checked her legs for rigidity and observed "more bruising." The State asked if Amy "had bruises covering almost her entire body?" Green responded, "Yes," and noted that he had never seen bruising to "that extent." Green believed that Amy had not had a heartbeat "for a decent amount of time" because Amy was cool to the touch. Green explained that Amy had been deceased for "a while" because she "had a stiffness to her arms."

In Green's opinion, Amy was not lying in a "natural position" and "somebody did that. Because if she would have crawled on the floor, the pajamas wouldn't have been straight," and "[k]ids don't think to pull their sleeves down, pull their legs down to make sure everything's tucked in." When shown a picture of Amy's chest, Green said that it did not appear CPR had been performed, as he saw no "notable red area anywhere" on Amy's chest indicating that CPR had been performed.

Green testified that he observed his "lieutenant . . . the officer in charge" tell Amy's parents that Amy had died. The State asked, if they "appeared to be emotional or upset at all that point?" Green replied, "Extremely calm. Abnormally calm," which was a "red flag" because usually the news of the death of a loved one causes the family to become

6

"hysterical."

Brady Young, a firefighter who responded to the 911 call concerning Amy, testified that when he arrived, he observed "[n]o real emotion shown from any of the family members at that time," and that "[t]here was a concern about the dog getting out of the front door. Nobody was with the patient." Young noted that Amy "was alone in the room," and they had to ask "where she was just to find her." Young said, "There was confusion" because no one stated that Amy had a twin sister, "[s]o when we came in and saw [a six-year-old] . . . female sitting up on a couch, so we had to ask if she was the patient." Young did not recall any sense of urgency, which he found to be "odd," and he had never witnessed parents behaving like appellant and Hopper. Young said, "From what we observed, no CPR was performed prior to our arrival." The State asked if the "state of" Amy's body "st[u]ck out" to him, and Young said, "Absolutely." Young explained, "She was very uniformly laid out, legs together, hands to her side, flat on her back. Her pajamas were very neat. . . . You know . . . nothing was disheveled in the slightest," and the scene "did not look appropriate." Young testified that there is "no doubt" that Amy had injuries that had been made over time because "[t]here were multiple stages of healing. So you had fresh wounds, and some that were obviously older and had started that process . . . yellowing and darker bruises."

Sergeant Austin Stearns, a Bryan police officer, testified that he responded to the dispatch for a six-year-old female in cardiac arrest, which he found to be "very strange." Sergeant Stearns arrived at appellant's residence approximately nine minutes after he heard the dispatch, and when he entered the house, he saw appellant, Hopper, and Amy's

7

twin sister, Belinda, in the living room. Sergeant Stearns said it was "odd" because "nobody was crying. There was no chaos. It was just very strangely calm in the house." Sergeant Stearns testified that Belinda "was also showing visible injuries and bruising to her person. She complained to several officers, and later to me, of pain, and she behaved in a manner consistent with being in pain." Belinda "was wincing in pain" when she got up from the couch, and "[s]he moved real slow and gingerly, just not in a manner at all consistent with a . . . healthy, well six-year-old child." Sergeant Stearns said, "It was like watching an elderly person get up off the couch or someone who is injured and sore and hurting." On cross-examination, Sergeant Stearns stated that Belinda told him that Hopper had "hit her with a paddle."

Sergeant Stearns testified that he and another officer discovered that Amy was deceased, and medics "[s]aid that she was . . . 'beaten to a pulp.'" Sergeant Stearns stated, "She was purple and bruised and just green bruising as well, swollen all over her face and her body as well. I had never seen anything like it." On cross-examination, Sergeant Stearns clarified that within five to ten minutes of his arrival, after he discovered that the child was deceased and "upon [his] observation of the child and seeing the injuries being inconsistent with the report [they] received of a fall, [he] determined it was a crime scene." Sergeant Stearns said, "When I was coming back out of [Amy's] room, I heard [appellant] telling medics that the girls were rough and tumble. And to me, it sounded like she was trying to blame the injuries on the girls' rough play." This explanation did not "square" with what Sergeant Stearns observed.

Officer Aaron Winton, a Bryan Police Department officer, testified that he

responded to the scene and took pictures, of among other things, a leather belt with "rivets that are actually lining that belt," which are "metal buttons that are on the side of the belt. Then when you flip it over, they have the little clippings where you punch them to the hole right here. And so that's what we're referencing when we talk about rivets." Officer Winton testified that the rivets on the belt matched some of the injuries on Amy's body.

Officer Winton took pictures of the back porch steps because it had been reported that Amy had "[fallen] down the back stairs." The trial court admitted a picture of the porch, which only has two steps. Officer Winton testified that trash was collected, which included "three plastic ice bags, pair of shoes, [wet] pants, socks and underwear which appeared to have [been defecated in], and hair clumps, Q-tip, and another plastic baggy."

Candido Amaya, a Bryan Police Department detective, testified that he saw Amy lying on her back on the floor and noticed "immediately apparent" and "severe" injuries as her "whole face was covered in bruises around her head," and "[s]he had significant bruising all over her torso . . . her stomach," her back, and her legs.

According to Detective Amaya, neither Hopper nor appellant were emotional. Appellant was "[j]ust kind of aloof of the whole situation." Detective Amaya interviewed appellant after seeing Amy's body, and appellant did not "ever get emotional" during the entire conversation. Detective Amaya testified that he did not "get the impression" that appellant was afraid of Hopper or that Hopper had "told her to do things or say things."

Lucas Wieck, M.D., a licensed forensic examiner and deputy medical examiner with the Travis County Medical Examiner's Officer, testified that he performed an autopsy on Amy. The trial court admitted photographs of Amy's injuries taken during the autopsy,

and Dr. Wieck explained the appearance and location of the contusions and abrasions in some of the photographs. Dr. Wieck determined that the cause of death was "blunt trauma" due to the overwhelming nature of the injuries and the manner of death was homicide. Dr. Wieck explained, "Blunt trauma is a category of injuries associated with impacts from blunt objects. They are broken down into categories of abrasions which are scrapes, contusion, which are bruising, and in some cases lacerations which are tears on the skin" and "[h]omicide is a manner of death that's issued when the circumstances indicate the trauma was caused by another individual." Dr. Wieck said, "Given the circumstances of this case, the findings were consistent with abusive injury which is why the manner was determined to be homicide." Dr. Wieck had not "seen a case that had injury, blunt trauma this extensive before."

Dr. Wieck testified that there were red and overlapping areas of bruises on the forehead, "the periorbital regions—which is the soft tissue around the eyes—as well as the cheeks and lateral left aspect of the lips. There were also multiple abrasions that involved the forehead, as well as the periorbital region on the right side as well as the left side." Dr. Wieck noted, "[i]t's extensive" and "[t]here were also some abrasions that were located around the peroral region around the mouth. And also there were some abrasions with contusion on the chin as well." Dr. Wieck clarified there was evidence of impact to "the soft tissue around the eyes," the mouth, the cheek, and "some abraded contusion on the right ear as well as the left ear." Although Dr. Wieck could not accurately determine the number of impact sites on Amy's face and neck, he documented fourteen.

Dr. Wieck found injuries to Amy's scalp, explaining he found red and overlapping

"areas of contusions that involved the frontal scalp which is on the anterior aspect of the top of the head as well as the occipital scalp which is the back of the head and the bilateral parietal and temporal regions of the scalp, which is essentially both side of the head." Dr. Wieck said, "So as a separate injury, there was what's called a subdural hemorrhage which is bleeding that's within the outer membrane that surrounds the brain. It's also a finding that's consistent with blunt trauma, and it was most focally thick on the right side of the head overlying the brain." Dr. Wieck explained that "a subdural hemorrhage is a collection of blood that's within the subdural space," which is "between the brain and the outer membrane called the dura mater"; "[i]n cases of blunt trauma or just trauma in general, you can have lacerations of those blood vessels," and the blood "begins to pool in the subdural space. And that will cause a subdural hemorrhage."

Dr. Wieck found five subarachnoid hemorrhage sites, which "is bleeding that's within the inner membrane that surrounds the brain" and "can also be caused by blunt trauma." Dr. Wieck testified "there was a foci which is an area of hemorrhage on the right temporalis muscle. So that's the muscle that lies over the temporal area [the temple in front of the ear] on the skull." Dr. Wieck said, "There were also some contusion[s] on the posterior neck . . . and on the left side of the neck."

There were red and overlapping contusions "over a broad surface involving the anterior chest and lower abdomen." She had "petechial hemorrhages," which are ruptures of small blood vessels, "some of which formed linear discontinuous markings that were also present on the chest and abdomen." There were several impact sites on her trunk. Dr. Wieck explained, "[I]f there's some abrasion, that would denote an impact site." Amy

11

had "multiple abrasions and contusions that were on the posterior aspect on the back that were also broad areas some of which were overlapping." According to Dr. Wieck, the injury on her back was deep because when he removed the skin, he observed "broad areas of hemorrhage within the soft tissue . . . that would be consistent with blunt trauma."

During his internal examination, Dr. Wieck found injury to the large intestine, which "looked like some contusion on the surface of the large intestine which . . . looking under the microscope, essentially showed hemorrhage." Dr. Wieck agreed with the State that this possibly meant "that some blunt trauma had to be hard enough to reach down through the skin, muscle, and tissue and actually cause damage to the underlying organ." Upon Dr. Wieck's internal examination of Amy's arms and hands, he found areas "where there was some deep soft tissue hemorrhage with overlying contusions . . . and some abrasions." Dr. Wieck clarified he saw overlying deep bruising that was hemorrhaging into the deep tissue on Amy's arms, forearms, and hands and made the same discovery on Amy's lower extremities. Dr. Wieck found nine areas on the upper extremities and twelve for the lower extremities, with evidence of blunt trauma.

Dr. Wieck testified that he had "received" a belt with Amy's body to examine. The State asked, "And on State's 105, [(an autopsy photograph)] were you actually marking up the fact that you can see a specific area that lines up with the belt?" Dr. Wieck replied, "Yes. So there's an area of contusion that's circular here along with a semicircular linear mark that is consistent with the belt that was received." On cross-examination, Dr. Wieck testified that "there were noted abrasions on the buttock region which would indicate scrapes, so an actual impact site from an object whatever it may be."

12

Marion Forbes, M.D., a pediatrician and expert on child abuse, testified that she consulted on the cases involving Amy and Belinda. Dr. Forbes stated, "I received information about both girls' past medical history, the pediatrician visits, their birth and hospital visits . . . from CPS and law enforcement about events that they were part of and certainly about circumstances of [Amy's] death." Dr. Forbes also reviewed the autopsy report. Dr. Forbes testified that based on data, there are certain childhood injuries that are "considered normal . . . from playing, falling, those kinds of things compared with the locations and circumstances where . . . the bruising is not typical." According to Dr. Forbes, typical childhood injuries include bruising that "tends to be on the front of the body because they in general are moving forward in space"; therefore, typically, cuts and bruises on children tend to be "over bony surfaces" where "the force against the skin overlying bone is going to produce a bruise or a cut or a scrape." Dr. Forbes explained that the back of the body and "softer areas not overlying bony surfaces . . . what we call the triangle area of the neck, ears, face—that triangle is a relatively protected area from accidental bruising." Dr. Forbes stated this includes the abdomen and back, which "are areas that are not typically going to be normal childhood falls." Dr. Forbes opined that because Amy had "bilateral hearing loss, what we call sensory neural hearing loss, along with this, speech delay," she was at a greater risk of being abused.

Dr. Forbes did not observe anything in the children's medical records that suggested any underlying medical conditions, and "[t]hey both seemed completely healthy and developing in line with children their age." When reviewing the pictures taken by the police, Dr. Forbes said, "the first thing that jumps out is the extent of the bruising

that [Amy] sustained, but as well the bruising on [Belinda]." Dr. Forbes testified that both girls "had bruising in areas of great concern: about the head, face, neck, eyes, back, abdomen, flank, all sorts of really high-risk areas." Dr. Forbes explained that the injuries went "way beyond anything that normal childhood play would create." Dr. Forbes stated that she saw patterned bruising on Amy consistent with either a hand, belt, or a paddle. Dr. Forbes discussed and described the significance of several photographs admitted into evidence. Dr. Forbes testified that bruising on Amy's face shown in the photograph was extensive. Dr. Forbes explained that the ears are not easily injured because they are composed of cartilage, which is soft and flexible "and tends to compress in." Dr. Forbes said, "[S]o we'll typically see a bruise on the front side and the backside of the ear or a very direct blow that [is] quite forceful." While reviewing a picture of Amy's eyes, Dr. Forbes stated, "[T]hese are what we call raccoon eyes, this particular configuration of bruising about her eyes," which "generally comes from blood in the brain," and "not a sign of impact to the eye itself" but "a very characteristic sign of basilar bleeds," which Amy suffered. Dr. Forbes said, "And it's some of the worst of the bleeding of the brain, basilar bleeds." Dr. Forbes explained that one can see "straight line bruising" on Amy's torso indicating "that she was struck with, again, a flexible straight object" such as a belt or a cord and was not the result of typical childhood injuries. There were "many, many, many straight lines crisscrossing and over each other," which "those large areas of bruising, you don't get that from just one impact." Dr. Forbes opined that the repetitive blows to Amy's body caused serious bodily injury, including a hemorrhage in her large intestine. The picture of Amy's back shows that she had "really extensive bruising to the entire back,

14

and buttocks" and there is patterned bruising indicating that an object was used to hit Amy. There were cuts on Amy's buttocks with bruising, which "indicate direct impact, direct blunt trauma." Dr. Forbes stated, "There's straight lines within those abrasions, plus in different orientation is to the buttocks" indicating that an object was used to create those injuries. Dr. Forbes testified that the belt found in the home matched some of Amy's bruising. Dr. Forbes said that the belt has "rivets on it which are raised and strike the skin and produce those very circular bruises that completely match in terms of their distance apart." Dr. Forbes explained that Amy "had extensive bleeding into the muscle of many . . . areas: arms, legs, torso, scalp," which are "very painful." Dr. Forbes testified that she saw "the suggestion" of what she believed to be a handprint on Amy's torso and finger marks on Amy's forearms, indicative of grabbing. There were multiple blows in the same location on Amy's legs. Dr. Forbes attributed the bruising on Amy's cheek to "direct blows." Amy has extensive upper chest bruising and "blows to the windpipe" that "could definitely make her stop breathing." There was "bruising all the way in the space between the ribs" which required a high degree of blunt force. Dr. Forbes testified that many of the linear bruising matched the belt with rivets.

Dr. Forbes testified that the multiple areas of bleeding in the brain were not caused by a single fall because "all the force is transmitted to the one part of the head that hits the ground." The amount of force necessary to cause the blood bleeds suffered by Amy require "multilevel falls which are falls over 14 feet—over 15 feet, basically over single-story falls. So second, third-story falls" or "pedestrian-versus-motor-vehicle crashes."

Dr. Forbes explained that the onset of symptoms from the head injury Amy suffered

15

would have been immediate, with symptoms such as nausea, vomiting, headache and would have progressed "to dizziness, stumbling gait, lethargy, and then not being able to breathe." According to Dr. Forbes, appellant "talked about [Amy] stumbling and wobbling about, jerking about. She said [Amy] complained of a headache. Had to give her ibuprofen." Dr. Forbes said it would have been immediately apparent "[w]ithin a few minutes" to a reasonable person that Amy needed medical care, "[a]nd as [the symptoms] progressed—yeah, within half an hour a child like this would look very ill and not at all normal." On cross-examination, Dr. Forbes clarified that due to "the extent of the seriousness" of Amy's condition prior to her death, "a layperson should [have] been able to recognize that their child is ill."

Dr. Forbes concluded that Amy "was the victim of child physical abuse and probably of torture as well." Torture is medically "described as systemically demeaning, subjugating, and controlling the victims in conjunction with physical and psychological abuse and neglect." Belinda provided a history "of multiple episodes of beating, largely around eating, meal time issues, issues of that and toileting," and Dr. Forbes believed "that the toileting dysfunction specifically is probably a behavioral response to trauma, the extent of trauma that these girls were dealing with on a repeated ongoing chronic basis." Belinda "outcried to both parents applying paddles, belts, and hands to their bodies."

The State asked if prior to her death Amy suffered what Dr. Forbes believed "to be serious bodily injury as it relates to injuries to her large intestines and abrasion and bruises and marks and deep tissue injury that she suffered?" Dr. Forbes replied, "Yes,

16

the extent of bruising is evidence of serious bodily injury apart from the head trauma."[2]

Belinda, who was nine years old at the time of trial, testified that Hopper used the paddle on Amy and that both Hopper and appellant would "spank" her and Amy. Specifically, Belinda said that appellant would use a belt to spank them "[l]ots of times" which would leave marks on her "butt." Belinda said that the day of Amy's death, appellant "threw" her in the bath with her clothes on. Belinda said, "[S]he throw me outside and then throw me in the backyard, and then she lock me outside." Belinda testified that appellant "sprayed" her with the hose outside. Belinda said, "She only told me to stay out here and think about, but I don't like to think about it outside. It was cold outside." According to Belinda, Hopper broke her finger by hitting her with the paddle.

Rebecca Wendt, a supervisor with the Bryan Police Department Crime Scene Unit, testified that she analyzed several phones, including Hopper's phone and appellant's phone. Wendt read several messages sent between Hooper and appellant. In one message, appellant told Hopper that Belinda had "swallowed her food before the second timer," but Amy "did not" and therefore "got two more spankings before she swallowed her food." Appellant informed Hopper that both girls were currently "in the corner until nine." Hopper responded, "I'm sorry, love. Well, at least [Belinda] ate, but she had to get spanked to do it." Appellant said, "That's why they are in the corner. . . . And, yes, she tested, and she found out you and I have the same rule and the same consequence." Appellant sent a picture of Belinda to Hopper on September 8, 2020, admitted into

---

[2] Liza Dyess, a licensed professional counselor at Scotty's House Child Advocacy Center, testified that Belinda "shows significant signs that she's experienced a lot of ongoing and chronic trauma."

17

evidence, that according to Wendt "clearly" shows bruising on her face. Appellant sent a message to Hopper on September 10, 2020, stating, "Had to spank [Amy] to make her swallow." On September 11, 2020, appellant sent a message stating:

> We were late getting to the table. It's not your fault. If they are still eating when the timer goes off, they get five swats on the butt. Consistency. They both got five swats. Now [Belinda] is eating faster and [Amy] is not. They have ten more minutes. She just knocked her bowl on the floor, so now she is eating it off of the floor—off the floor. They just keep trying to get spanked. So after another round of spankings, they are in the corner. Both finally ate their food. [Belinda] peed on the floor again and got extra swats. They are in the corner until 9:00 AM. Then schoolwork begins. [Belinda] is sleeping on the rug tonight. She must stop peeing everywhere. It's her weapon.

> On September 14, 2020, appellant said:

> The fucking girls did not eat. Didn't even try. Thirty minutes of spanking to make them swallow the bite in their mouth. They are in the corner waiting for you at lunch. They are eating their breakfast at lunch.

> [Amy] finished by the timer. [Belinda] did not, and she finally swallowed her food around 2:00 PM. I had to spank her twice. They have been doing schoolwork since. I have been working on their laundry and dishes. I just pumped the house and put the dogs out to potty.

The next day appellant sent a message to Hopper informing him that she told Belinda to "potty and swallow her food before" getting a spanking, but Belinda would "not do what she is told." Appellant said, "She pooped, peed, and swallowed then got her spanking. Now she has 15 minutes to finish her food." On September 15, 2020, appellant wrote, "Fuck this little bitch. She still won't eat, won't swallow. Fuck her. She is holding [Amy] back and had the nerve to tell me my spankings don't hurt." On that day, appellant's adult son, Dylan Berry, texted Hopper stating, "Yo, just between you and me, mom is going fucking overboard on [Belinda]. Like way past what's necessary." Hopper replied, "I know. I don't know what to do. [Belinda] is asking for it." Appellant then texted Hopper

18

that she and Amy were "taking a break" and that Belinda "is lying in the bathtub being stubborn, naked, and wet. I hope she is hungry and cold." She also sent a picture of Belinda lying in the bathtub to Hopper. On September 17, 2020, appellant texted Hopper that Amy was refusing to swallow, and Hopper told her to "[j]ust put her on schoolwork, if you want, and I'll deal with her when I get home." Appellant replied six minutes later, "They both got spankings and corner time. [Amy] fell to the fucking floor when I told her to bend over, and she hit her head. I am so tired of this bullshit." Appellant later texted, "They are both in bed with ice packs" with a picture of the children "pressing ice packs to their faces." On September 21, 2020, appellant texted, "Thirty minutes to eat an apple Nutri-Grain bar and 30 minutes of spankings to get her to swallow without spitting it out. Here we go again." Next, appellant texted that neither child swallowed and "[t]hey both got a spanking," and "I am not feeding them for 48 hours."

Dylan sent a text to Hopper stating, "Belinda just fucked up big time with the pregnant one." Appellant was pregnant during this time. On October 6, 2020, appellant texted Hopper, "I had to give [Belinda] five swats twice to get her to swallow her peaches. She still has a bunch to finish when we get back." On October 7, 2020, appellant said, "[Amy] sat at the table and immediately started that fake cry she does. So we started the day with swats. [Belinda] yesterday, [Amy] today. Here we go again. It took about 25 more swats before she finished her food, swallowed, and drank her juice, but all good now." On October 16, 2020, Dylan texted Hopper, "She straight beating [Belinda] in the back of the head with the damn belt. She's been at it for 15 minutes straight. She's going to have a miscarriage if she doesn't calm down."

19

On October 8, 2020, appellant texted, "Had to spank [Amy] to get her to swallow her Trix. Ridiculous that they swap out days to pull this crap. They are both in the corner now." Hopper replied, "Yeah, fuck that. Sorry, love." Appellant responded, "It is what it is. They are testing me again. I have to stay consistent. If they like getting swats until [their] bottoms are purple, then so be it." Appellant then texted, "[Amy] is on a roll today—not doing what she is told. She just got another spanking. Yeah, fuck them right now." There are several more of these messages stating that either one or both of the children had not swallowed her food and had either been spanked, placed in the corner, or both. On October 20, 2020, appellant said, "Look who won't eat today. Look who just got a spanking for crying instead of eating" with a picture of Amy. Next, appellant texted, "Okay, so they're in the corner because [Belinda] said she knew [Amy] peed her pants." Appellant said, "Then they woke up this morning and started all over again with [Amy] being the bad one. I need prayer. I need peace. Dylan woke up pissed when I was spanking [Amy], and then he started yelling at me. [Amy] has been at it all day, and I just keep saying 'Jesus.'"

On October 21, 2020, appellant texted:

> So she got ten swats on the butt with the belt, and now she is in time-out while her sister watched cartoons. If you zoom in, you will see she only spit up the apple juice and ibuprofen, none of the milk or cereal came up. This is why I think she is gagging herself on purpose to fake being sick. [Belinda] was doing the same thing last year before she started the not swallowing mess. I am not giving her anything else today except water.

Appellant later texted, "She has to learn that it is not okay. And if being hungry is the only way for her to learn, so be it." Next, appellant texted, "I told [Amy] to . . . go potty. I said, 'is there potty in your pants?' She said no. I checked her pants. And she had pee in her undies again. She got spanked for lying to me."

20

On October 22, 2020, appellant told Hopper that she spanked Amy again, took a shower, and when she checked on Amy, Amy "was playing with her fingers, not chewing"; so appellant "gave her ten swats and gave her five minutes." Appellant attached a picture of Amy with bruising to her face and stated, "I got dressed and came back to this." Hopper replied, "WTF." Appellant responded, "So while spanking her, this happened."

On October 24, 2020, Hopper sent a picture of a paddle to appellant stating, "Just ma[d]e this." Appellant replied, "That's nice[!] Although I hate that we have to use it. I wish they would just straighten up and follow the rules." Appellant said, "I told them they can have medicine if they eat their food because they have stuffy noses." On October 26, 2020, appellant informed Hopper that Amy took one hour to finish eating and was "getting swats." Appellant then texted, "[Amy] got ten swats with a belt and is in the corner now."

On October 27, 2020, the day of Amy's death, appellant texted a picture of Amy with her pants pulled down with feces in her underwear stating, "The wet spot is shit." Hopper replied, "WTF. I'm sorry, baby." Appellant said, "She is being absolutely disgusting." The picture shows that Amy's legs are bruised. At 3:41 pm, appellant said, "I spanked her for an hour, and she still will not swallow the same bite of food. I'm going to get ice." Then at 4:51, appellant told Hopper,

> She is being stubborn to the extreme. Will not do anything I say now. Was spanking her, and she kept rolling onto her back, and they would not roll back over. Then she started shitting all over the bed and floor. Still has food in her mouth. Now she will not get up or get dressed. She just keeps looking at me like it's all my fault. I told her she has to stay on the floor because she keeps pooping everywhere. So every punishment I dish out she rebels even more.

Hopper responded, "Just put her in the shower. When I get off, I'll deal with her." Appellant

then texted, "She keeps falling to the floor and hitting her head on whatever is close by. I just don't know what else to do. I did put her in the shower twice. I didn't want her to get too cold, so I got her out," and "[s]he is laying on the floor in her room. I gave her clothes to put on. But she is just lying there." Hopper replied, "Put her on the toilet if she can't stop shitting." At 5:11 pm, approximately three hours before Hopper called 911, appellant texted that Amy was "lying, just needs to nap" and that appellant "tried to give her ibuprofen, and she spit it out." Appellant said, "So fine, she can just lay there. Spanking her does not work. She has it in her mind that if we discipline her we are wrong," and "[s]he keeps acting out worse every time we give any punishment."

Appellant testified that she is a paralegal with her own business and a licensed process server. Appellant admitted that she spanked Amy and Belinda "on their butt" with her "hands or with the leather belt" with rivets because Hopper told her to "spank them." Appellant explained that she would "fold" the belt "completely in half with the rivet end in your hand and the end of the belt in your hand." Appellant acknowledged that there were belt marks "over their body" but denied that she had made those marks. Appellant stated that she did not believe that the paddle should be used on children, but she agreed that when she saw the text picture of the paddle, she said, "Nice!" Appellant denied using the paddle and stated that she never saw Hopper discipline the children but assumed he spanked them in a responsible manner. Appellant stated that before he went to work after eating lunch on the day Amy died, Hopper spanked Amy with the paddle, and then she "took it with [her] two fingers and set it down." According to appellant, she and the children went about their day normally after Hopper left for work. Appellant claimed that Amy

22

finished eating, and "tripped going out the back door" to play outside.

Appellant claimed that she had CPR training "a long time ago" and performed CPR on Amy when Hopper told her Amy was not breathing. Appellant testified that the 911 operator instructed Hopper to tell appellant not to perform CPR on Amy because she is not Amy's mother, Hopper started CPR, and appellant left the room. Appellant denied that she gave Amy an ice bath on the day of her death and claimed that she always put any ice that did not fit in a nonoperational ice maker in the bathtub; "[t]hat way it could melt. It could go down the drain." Appellant stated that while being interviewed about what happened to Amy, she wanted to call an attorney to listen to the interview, but she was not allowed to do so because the police took her phone.

On cross-examination, appellant stated that if the children said "[b]ad words, if they cussed, was supposed to be a little soap on the tongue." Appellant did not recall why she said, "fuck that little bitch," and she denied that the text expressed anger. She explained, "I believe in a moment that was just the text that got sent." She also denied being angry when she texted, "She's still won't eat, won't swallow. Fuck her." Appellant acknowledged that she spanked the children because Hopper "said if they continue to potty in their pants, they should get swats." When shown the picture of Amy with her soiled underwear, appellant agreed that Amy "was literally purple from right above her knees up through her bottom," and that it was "uncomfortable to sit down on that butt on a cold, hard toilet." Appellant claimed that the bruising on Amy's legs happened when Hopper "paddled her." According to appellant, she continued to spank Amy on the butt with a belt even though she saw the serious bruising. Appellant explained that "[m]ost times when she receives

23

swats, her pants were up." Appellant agreed she sent a text to Hopper at 3:41 "almost four hours later" stating that she "spanked her for an hour, and she still won't swallow that same bite of food" but denied that she actually spanked any child "constantly" for an hour. The State asked, you continued to spank her for an hour "[a]fter you're telling me that there was this terrible death blow leveled against her at lunch?" Appellant replied, "I did not know at that time that he had hit her with the paddle in the head. I had no idea she had been injured."

Appellant could not explain why there is a picture of the children with ice packs on their eyes and heads. Appellant acknowledged that she saw that Amy had raccoon eyes but explained that she "attributed" them "to the bump on her head from when she fell." Appellant stated that Amy had been "in the bathtub a couple of times" the day she died but could not recall if the ice was in the tub at the same time. Appellant acknowledged that she did not tell the police that Hopper paddled Amy on the day she died and merely stated that Amy had fallen down.

## C.    Analysis

Considering all the evidence in the light most favorable to the verdict, the evidence showed that appellant used a belt with rivets to "spank" Amy on multiple occasions on the day of her death. The jury could have reasonably inferred that appellant used the belt to hit Amy on the head, stomach, arms, legs, butt, and back based on evidence that she beat Amy during various times of the day of her death, that the belt matched the numerous injuries inflicted on Amy, appellant's texts to Hopper that she beat Amy for an hour, and that appellant denied seeing the extreme nature of the bruising, which was readily

24

apparent and lied to the police and during her testimony about only hitting Amy on the butt with the belt and how Amy was injured. There is evidence that Amy suffered serious bodily injury to her head, which caused her death, and to her large intestine. *See Dawkins v. State*, 557 S.W.3d 592, 604 (Tex. App.—El Paso 2016, no pet.) ("While it is impossible to tell if Appellant or Nakia struck the blow that caused Milayna's death, the severity of the head injuries would make it rational for the jury to reject the innocent explanation offered by the Dawkinses, particularly in light of their inconsistent statements to police and the medical evidence and testimony.") The jury could have reasonably inferred that appellant intentionally and knowingly caused serious bodily injury to Amy from the evidence of the extreme nature of the beating inflicted on Amy and severe injuries she suffered. *See* TEX. PENAL CODE § 22.04(a)(1); *see also Jefferson*, 189 S.W.3d at 312. Therefore, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt based on the evidence and reasonable inferences from that evidence. *See Whatley*, 445 S.W.3d at 166; *Brooks*, 323 S.W.3d at 898–99; *see also Hill v. State*, 883 S.W.2d 765, 769 (Tex. App.—Amarillo 1994, pet. ref'd) (listing surrounding circumstances that sufficiently "support the inference of the intent to cause serious bodily injury" as evidence of: (1) "prior abuse by the accused and recent injury to the child,"; (2) "significant force applied by the accused to produce severe injuries to the child"; (3) "injuries to the child coupled with the accused's admission that he had 'beaten' the child"; and "the accused's failure to secure medical aid known to be needed for the injuries inflicted"). We overrule appellant's first issue.[3]

---

[3] Having found the evidence sufficient to prove one of the State's theories of liability, we need not address appellant's second issue as it is not dispositive. *See* TEX. R. APP. P. 47.1; *see also Jefferson v.*

## II.    AUTOPSY PHOTOGRAPHS

By her third issue, appellant contends the trial court erroneously admitted several crime-scene and autopsy photographs. Specifically, appellant argues the complained-of photographs "are the type of evidence that would influence a jury to make a decision based on emotions" and "are inflammatory and unfairly prejudicial."

### A.    Applicable Law and Standard of Review

"Rule 403 provides that relevant evidence 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.'" *Sanchez v. State*, 418 S.W.3d 302, 310–11 (Tex. App.—Fort Worth 2013, pet. ref'd) (first citing TEX. R. EVID. 403 and then citing *Gigliobianco v. State,* 210 S.W.3d 637, 640 (Tex. Crim. App. 2006)). "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Id.* (citing *Shuffield v. State,* 189 S.W.3d 782, 787 (Tex. Crim. App.).

The trial court has discretion in determining the admissibility of photographs. *Rayford v. State,* 125 S.W.3d 521, 529 (Tex. Crim. App. 2003). The trial court does not abuse its discretion if the determination lies within the zone of reasonable disagreement. *Id.* Generally, autopsy photographs are admissible unless they depict mutilation of the victim caused by the autopsy itself. *Id.* Likewise, pictures of the crime scene although gruesome are generally admissible. *Long v. State*, 823 S.W.2d 259, 273 (Tex. Crim. App.

---

*State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006); *Creel v. State*, 710 S.W.2d 120, 130–31 (Tex. App.—San Antonio 1986), *aff'd*, 754 S.W.2d 205 (Tex. Crim. App. 1988).

1991) ("We agree with the prosecutor's assessment that some of these exhibits are gory, but this offense was horribly gruesome and that fact alone will not render the probative value of the exhibits substantially outweighed by any prejudicial effect.").

If the photographs are genuinely helpful to the jury in making its determinations and any emotional and prejudicial aspects of the photograph do not substantially outweigh the helpful aspects, the photographs are admissible. *Erazo v. State,* 144 S.W.3d 487, 491–92 (Tex. Crim. App. 2004). In determining or reviewing the admissibility of a photograph, the courts consider the following non-exclusive set of factors: (1) the probative value of the photographs; (2) the potential of the photographs to impress the jury in some irrational, yet indelible way; (3) the time needed to develop the evidence; (4) the proponent's need for the evidence; (5) the number of photographs; (6) the size of the photographs; (7) whether the photographs are in color or in black and white; (8) whether the photographs are gruesome; (9) whether the bodies depicted are clothed or naked; and (10) whether the body has been altered by autopsy. *Id.* at 489.

## B.     Discussion

State's exhibits 5, 6, and 7 were photos of how Green found Amy's body lying on the floor, chest up, with pajamas on, showing visible signs of bruising to her face, raccoon eyes, and bruising to her chest. Another photo shows Amy's chest with her shirt lifted up and visible bruising to her chest. The last picture shows Amy's body covered with a blanket. Appellant next complains of State's exhibits 39–56, which are pictures taken by Winton of Amy's body at the residence on the night of her death. Finally, appellant complains of State's exhibits 91, 93–105, which are autopsy photographs.

27

The photographs from the crime scene were relevant to show the degree of injuries Amy suffered and were taken of different parts of Amy's body. *See Woods v. State*, 14 S.W.3d 445, 452-53 (Tex. App.—Fort Worth 2000, no pet.) (determining that the crime scene photographs were not cumulative because they showed the injuries the child suffered from a different angle, closer up, and clearer compared to another admitted photograph). The photographs from the autopsy did not show any mutilation that occurred during the autopsy and were relevant to show that the extent of the injuries and that they were caused by the belt with rivets. Thus, the complained-of crime scene and autopsy photographs were probative to show that appellant had tortured Amy, that she had the requisite culpable mental state, and that she caused serious bodily injury. *See id.*; *see also Martinez v. State*, No. 05-04-01422-CR, 2006 WL 949901, at *8 (Tex. App.—Dallas Apr. 13, 2006, pet. ref'd) (mem. op., not designated for publication). Therefore, the trial court properly determined that the evidence of Amy's condition was relevant, probative, and necessary. *See Woods*, 14 S.W.3d at 452–53.

Appellant complains globally that the photographs were graphic and inflammatory. However, the photographs were graphic because of the horrendous nature of the injuries that were inflicted on Amy. *See Chamberlain v. State,* 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) ("[W]hen the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence."). Moreover, the State informed the trial court it was not offering any photographs "after the scalpel ha[d] touched the body," and based on our review, none of the complained-of photographs depict Amy's body after

being mutilated during the autopsy. Viewing the photographs, we find no danger of unfair prejudice, confusion of issues, or any other Rule 403 factors, as they were no more gruesome than the crime scene itself. *See Erazo*, 144 S.W.3d at 489; *see also Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006) (explaining that because the crime scene photographs were not unfairly prejudicial because "none" of the crime scene photographs were any "more gruesome than the crime scene itself as it was found by the police"); *Narvaiz v. State*, 840 S.W.2d 415, 430 (Tex. Crim. App. 1992) ("Although a crime scene may be gruesome, 'that fact alone will not [necessarily] render the probative value of [photographic] exhibits [of the crime scene] substantially outweighed by any prejudicial effect.'"). Therefore, the trial court's admission of the complained-of photographs is within the zone of reasonable disagreement, and we conclude it did not abuse its discretion by admitting them. *See Rojas v. State*, 986 S.W.2d 241, 249 (1998) ("[A]utopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself."); *Ripkowski v. State,* 61 S.W.3d 378, 392–93 (Tex. Crim. App. 2001) (finding that a photograph of the victim's removed organ which exhibited the bruising that the appellant caused during the offense, was not unduly prejudicial and was highly relevant to the manner of death); *see also Gallo v. State*, 239 S.W.3d 757, 763 (Tex. Crim. App. 2007) (determining that although the photographs showing internal injuries on the victim's scalp that were not visible externally were gruesome, the jury would not attribute the mutilation caused by the autopsy to the defendant and that autopsy photographs were highly probative to show the full extent of the injuries appellant inflicted). We overrule appellant's third issue.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

By her fourth issue, appellant contends that her trial counsel rendered ineffective assistance by failing to object to the admission of inadmissible hearsay and extraneous offense evidence. Specifically, appellant alleges that her trial counsel should have objected to admission of Dylan's text messages to Hopper on the basis of hearsay and improper extraneous offense evidence.

### A. Standard of Review and Applicable Law

To prevail on an ineffective assistance of counsel claim the defendant must show that trial counsel was deficient, and based on "the totality of the evidence before the judge or jury, there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Martinez*, 330 S.W.3d 891, 900–01 (Tex. Crim. App. 2011) (citation modified). The defendant must show "that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result was reliable." *Id.* at 901 (citation modified). Merely showing "that the errors had some conceivable effect on the outcome of the proceeding" is not sufficient. *Id.* (citation modified). The defendant must show "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* (citation modified). Both prongs need not be examined by the reviewing court because "[a] failure to make a showing under either prong defeats a claim for ineffective assistance. *Junell v. State*, 607 S.W.3d 410, 414 (Tex. App.—Texarkana 2020, pet. ref'd) (citing *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003)); *see also Ledet v. State*, No. 02-10-00281-CR, 2013 WL 1830801, at *4 (Tex. App.—Fort Worth May 2, 2013, pet. ref'd)

(mem. op., not designated for publication) ("*Thompson* specifically states that the failure to make the required showing of "*either* deficient performance *or* sufficient prejudice defeats the ineffectiveness claim.").

B.    Discussion

Appellant complains the result would have been different but for her counsel's failure to object to Dylan's text messages stating that appellant beat Belinda on the head with a belt, that appellant was "going fucking overboard on" Belinda "[l]ike fucking way past what is necessary," and Belinda "just fucked up big time with the pregnant one." We disagree.

There is other evidence from which the jury could have reasonably inferred that appellant used the belt to beat Amy on the head. The jury viewed pictures of the injuries on Amy's body that matched the markings of the belt, saw that Amy's butt was cut and bruised and appellant stated that even after seeing that Amy was severely injured on her butt appellant continued to use the belt to beat her. The jury also heard the other text messages from appellant in which she spanked Amy multiple times on the day of her death and even "spanked" her for an hour on one occasion that day. Additionally, evidence was presented that the belt could have caused serious bodily injury to Amy, including the bleeding in her head that lead to her death and the injury to her large intestine. Moreover, the jury could have disbelieved appellant's explanations for Amy's injuries, claims that she did not observe the extensive bruising on Amy's body, and denials that she knew that Amy needed medical attention. *See Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021) ("When considering a claim of evidentiary insufficiency, we

must keep in mind that a juror may choose to believe or disbelieve all, some, or none of the evidence presented."). The jury could have reasonably inferred appellant failed to get proper medical treatment for Amy even though the seriousness of her injuries was readily apparent because appellant had caused serious bodily injury to Amy. *See id.* Furthermore, the jury could have reasonably inferred that appellant was lying because she was guilty. *See Ross v. State*, 154 S.W.3d 804, 812 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (explaining that a consciousness of guilt can be shown by evidence that the defendant made false statements to cover up the crime and that the appellant's made to the police which "contradicted other evidence presented at trial were relevant and admissible to show his consciousness of guilt" (citing *King v. State*, 29 S.W.3d 556, 564–65 (Tex. Crim. App. 2000)). Therefore, even if Dylan's text messages had not been admitted, the evidence was sufficient to support the jury's guilty verdict, and the result of the trial would not have been different but for counsel's failure to object to them on the basis of hearsay and extraneous offense evidence. *See Ex parte Martinez*, 330 S.W.3d at 902 (disregarding complained-of gang-related evidence and concluding that "the remaining evidence against Applicant, in its totality, is strong and would support a finding by the jury that Applicant was a party to the offense"); *see also Ellis v. State*, No. 13-19-00247-CR, 2021 WL 1133610, at *6 (Tex. App.—Corpus Christi–Edinburg Mar. 25, 2021, no pet.) (mem. op., not designated for publication) ("When the gang-related testimony is disregarded, the remaining evidence against Ellis, in its totality, is strong and would support a finding by the jury that he murdered Menefee."). Thus, appellant has not met

the second prong.[4]  We overrule appellant's fourth issue.

## IV.    CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
15th day of January, 2026.

---

[4] We did not address whether appellant's trial counsel was deficient in failing to object to the complained-of text messages; therefore, we need not analyze whether they were hearsay. *See* TEX. R. APP. P. 47.1.